1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11   CARLOS RUIZ,                        No.  1:14-cv-00224-LJO-JLT (HC)

12              Petitioner,              **FINDINGS AND RECOMMENDATION**
                                         **TO DENY PETITION FOR WRIT OF**
13        v.                             **HABEAS CORPUS**

14   CONNIE GIPSON, Warden,              **[TWENTY-ONE DAY OBJECTION**
                                         **DEADLINE]**
15              Respondent.

16

17        Petitioner is currently serving a life term in state prison for convictions for robbery,

18   carjacking and criminal street gang activity.  In this action, Petitioner claims: 1) The conviction

19   for criminal street gang activity is unsupported by sufficient evidence; 2) The trial court abused

20   its discretion in denying motions to bifurcate the trial on the gang issues; 3) The trial court erred

21   by allowing the use of case- and defendant-specific hypotheticals; 4) The trial court erred in

22   defining the immediate presence element of carjacking, as distinct from robbery; 5) The trial

23   court erred in failing to define the technical terminology: "in association with a criminal street

24   gang"; 6) The instructions on gang evidence and enhancements were erroneous; 7) The trial court

25   erred in instructing the jury with CALCRIM No. 373; 8) The trial court erred in instructing the

26   jury with CALCRIM No. 376; 9) The trial court erred in denying Petitioner's motion to dismiss

27   the case based on statutory speedy trial violations; 10) The cumulative effect of the errors denied

28   Petitioner of a fair trial; and 11) The trial court erred in calculating Petitioner's presentence

1    credits.  As discussed below, the Court finds no merit to the claims and recommends the petition

2    be **DENIED.**

3    **I.      PROCEDURAL HISTORY**

4        Petitioner was convicted in the Kern County Superior Court on August 10, 2010, of

5    carjacking (Cal. Penal Code § 215), robbery (Cal. Penal Code § 212.5(c)), and street terrorism

6    (Cal. Penal Code § 186.22(a)).  People v. Ruiz, 2012 WL 4076669, *1 (Cal. Ct. App. 2012).  The

7    jury also found true enhancements that Petitioner personally used a firearm in the commission of

8    the offenses.  Id.  He was sentenced to a term of 13 years plus 15 years-to-life.  Id.

9        Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

10   DCA").  The Fifth DCA affirmed the judgment on September 17, 2012.  Id.  Petitioner then filed

11   a petition for review in the California Supreme Court.  The petition was summarily denied on

12   December 19, 2012.  (Pet. at 2.)

13       On February 20, 2014, Petitioner filed a petition for writ of habeas corpus in this Court.

14   (Doc. No. 1).  Because two of the claims in the petition remained unexhausted, Petitioner

15   requested a stay of the proceedings.  (Doc. No. 2.)  The Court dismissed the two claims (12 and

16   13) from the petition and granted the stay.  (Doc. No. 5.)  Petitioner thereafter failed to timely file

17   status reports, and because of this the Court lifted the stay and directed Respondent to file a

18   response.  (Doc. No. 17.)  Respondent filed a perfunctory answer on June 14, 2016.  (Doc. No.

19   20).  Petitioner did not file a traverse.

20   **II.      FACTUAL BACKGROUND**

21       The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

22       ***Defendant and Harris get a ride***

23       Ashli Winters and Patrick Harris were close friends. Winters testified that on
         March 4, 2009, sometime between 2:30 p.m. and 2:36 p.m., Winters dropped off
24       Harris and defendant, who was his friend, in the area of Wilkins Street, near
         Kincaid and South Kings Streets in Bakersfield. [N.3] This location was a few
25       blocks from Key Barber Shop. Defendant and Harris got out of Winters's car
         together. They were both wearing black clothes. Defendant wore a black "hoodie."
26

27   ───────────────
     [1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
     Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
28   2009).

     2

Harris wore a black sweater or zipped-up sweatshirt with a hood. After Winters dropped them off, she drove away from the area and went to a friend's house.

> [N.3] Winters testified at both the preliminary hearing and trial under a grant of immunity.

### Key Barber Shop

Also on March 4, 2009, Robert Key was working at Key Barber Shop located on East Brundage Lane in Bakersfield. Key had owned and operated his barbershop since 1965, and he had never been robbed. He described his shop as a neighborhood place where people often gathered to visit.

Around 2:30 p.m., Key was cutting the hair of Mackinley Mosley, an investigator for the district attorney's office. Mosley was armed with his service weapon, a .40–caliber Glock handgun, which was in a waistband holster. Mosley had driven his county-issued white Dodge Charger to the barbershop, and parked it behind the business.

There were two other people in the barbershop: Joe McClary, Key's brother-in-law, and Aaron Williams, a retired sergeant from the Los Angeles County Sheriff's Department. Williams still carried law enforcement identification.

### The barbershop robberies

As Robert Key cut Mosley's hair, two masked men abruptly entered the barbershop. One man held up a gun, said it was a "'robbery'" or a "'stick up,'" and ordered everyone to get on the floor. One man was taller than the other. The taller man displayed the gun and gave the orders. He was dressed in grey and black with a hood that covered his head and part of his face. He also wore a mask which covered his face from the eyes down. The shorter man wore a hooded sweatshirt and was completely cloaked in dark clothing with a ski mask over his face, but his eyes were visible. Williams testified the men seemed to be wearing oversized clothing to disguise their appearances.

Key and his three customers did not immediately react because they did not realize what was going on. The taller man pointed the gun at Williams and Mosley, and again told everyone to get down. The taller man grabbed McClary and pushed him to the floor. Williams hesitated and the smaller man repeatedly ordered him to get down. McClary urged Williams to get down. Williams and the other men finally complied.

The taller man ordered everyone to throw their wallets on the floor. One of the suspects picked up the wallets from the floor. Key testified that one of the masked men took $40 or $50 from his cash box. The taller man reached into Key's pocket and took his wallet.

As Mosley got out of the barber chair and onto the floor, the smaller suspect realized Mosley was armed with a weapon and said, " ' Oh, he's got a gun, too.' " The smaller man removed Mosley's service weapon from his waistband. The smaller man thought he was taking Mosley's wallet, but he actually took Mosley's black "flat badge" identification. He told Mosley to remove his jewelry and Mosley complied.

The taller man noticed that McClary was also wearing jewelry and told him to take

3

off the pieces. McClary removed his Movado single-diamond, blackface watch; a gold-nugget/diamond ring; and a gold chain bracelet. McClary had trouble removing a diamond pinky ring from his finger. The taller man pointed his gun at McClary, repeatedly told him not to move, and threatened to "pop" him if he did not hurry and take off the ring. The taller man held the gun at the back of McClary's head and searched his back pocket. McClary was finally able to remove the ring. He placed the jewelry on the floor, and the taller man picked up the pieces.

McClary described the gunman's weapon as a black or dark grey semiautomatic handgun. McClary testified the taller man had a loose bullet in his hand. He dropped it on the floor, by McClary's face, and then picked it up.

The smaller man removed Williams's wallet from his rear pants pocket and took Williams's gold/diamond ring.

### The Dodge Charger

After the two suspects had taken money and jewelry from the victims, the taller man yelled out and asked who was driving the Dodge Charger. Mosley responded that the car belonged to him. The taller man said, "'Give me the keys.'" Mosley threw his keys on the floor. One of the suspects retrieved the keys.

McClary testified that as the two suspects left the barbershop, the taller man said, "'If anyone stick[s] their head out of the door, we're going to come back and kill everybody.'" The two suspects walked out, and McClary heard a car start and quickly accelerate away from the area.

### Defendant and Harris arrive at the apartment

Terrance Ellis's godmother lived in an apartment on Feliz Drive in Bakersfield. [N.4] Ellis testified that defendant used to visit the apartment and play dominoes with him. Ellis, who was 16 years old, knew defendant as "A–Loc" or "Baby A–Loc." Ellis knew Patrick Harris as "No Sense." Ellis testified that both defendant and Harris ran with the East Side Crips (ESC).

> [N.4] At trial, various witnesses pronounced this area as either "Felix" or "Feliz" Street or Drive. According to the People, the correct identification is Feliz Drive.

Ellis testified that defendant and Harris arrived at his godmother's apartment on a particular afternoon. [N.5] Defendant and Harris had a bag and some wallets. They told Ellis to get rid of the bag. Ellis refused because he did not want to touch the bag. One of the men had a gun under his shirt. At trial, Ellis could not recall which man was armed, but he previously stated that defendant had the gun. Defendant and Harris changed clothes and took off their black shirts.

> [N.5] Ellis identified defendant and Harris through separate photographic lineups. He also explained that Harris had a very distinctive tattoo of a dollar sign or something similar over both eyes.

Ellis testified that Harris made a telephone call from the apartment and asked someone for a ride. After defendant and Harris had been at the apartment for about 10 minutes, they left and were picked up in a vehicle.

4

### Winters picks up defendant and Harris

Ashli Winters testified that later in the afternoon, after she had dropped off defendant and Harris, Harris called her and again asked for a ride. Winters drove to Feliz Drive and picked up both defendant and Harris. Harris told her to drive them to a location on Miller Street.

During the drive, Harris produced a sandwich bag from his pants pocket. The bag was full of jewelry, including a gold or silver watch with a black face, a gold "nugget" ring, and a ring resembling a flower.

Winters testified that defendant and Harris discussed the jewelry, and defendant said something like, "[W]e can't take it to a pawn shop, 'cause they're gonna notice it." (RT 348) Defendant also said, "That was a cop." Winters did not know what defendant meant.

When Winters arrived at the Miller Street location, defendant and Harris got out of her car and then got into another vehicle. Winters could not see who was in the other car. Winters noticed that Harris was not wearing his black sweatshirt from earlier in the day. [N.6]

> [N.6] At trial, Winters extensively testified about why she cooperated with the police. Winters heard on television that she was considered a suspect in the barbershop robbery. Winters went to the police to clear her name. Winters conceded that she initially told the police that she never saw Harris. Winters testified she eventually decided to fully cooperate after the police threatened to take her child away.

### The initial dispatch

In the meantime, Mosley called 911 immediately after the two robbery suspects left the barbershop. At approximately 2:37 p.m., the Bakersfield Police Department sent out the first dispatch about the armed robbery, that the suspects fled the scene in a white Dodge Charger, and they had taken a firearm.

At 2:51 p.m., a police officer found Mosley's stolen Dodge Charger near the 800 block of McNew Court. It was parked at the very end of an apartment complex's parking lot. No one was in or around the vehicle. The stolen car was found about one-half mile from the barbershop. It would have taken about one or two minutes for someone to drive there from the barbershop. A black knit cap was under the driver's seat.

At 2:53 p.m., Detectives Dossey and Moore received the dispatch about the discovery of the stolen car. The detectives drove to that location and received information that two suspects had run northbound from McNew Court to the next street, which was Feliz Drive. There was an open walkway that led directly from McNew Court to Feliz Drive.

At 3:30 p.m., the detectives contacted Victoria Campbell, who was sitting in a car parked on Feliz Drive, and asked if she had seen anyone running in the area. Campbell said that she had seen two black males running "'through here.'" Campbell gestured toward the sidewalk between McNew Court and Feliz Drive. Campbell thought the men looked like black adults and believed they were wearing hooded sweaters. Campbell said the two suspects ran in the direction of the apartment building located at 900 Feliz Drive, directly across the street from

her residence. The apartment building was about a mile and one-half from the barbershop.

### Search of the Feliz Drive apartment

Detectives Moore and Dossey went to apartment A at 900 Feliz Drive. There were two females, two males, and children inside. The detectives conducted limited protective sweeps for the suspects and weapons. Dossey conducted a protective sweep of the bedroom area and did not find anything.

Detective Moore conducted a protective sweep of the kitchen and laundry room. He opened the dryer door because he had experienced previous searches where suspects had hidden inside the machines. Inside the dryer, he found two dark-colored, hooded sweatshirts which were wet. One sweatshirt had multi-colored stitching.

Moore also found a white plastic shopping bag on top of the washing machine. He opened the bag to determine if the stolen gun was inside. He did not find a gun, but discovered a sheriff's badge, a wallet, a Dodge car key, a handcuff key, and credit cards.

The apartment was subsequently searched pursuant to a warrant, and the officers seized a black-striped, knit ski cap and a pair of black gloves. The white plastic bag contained Key's wallet, Williams's wallet, a deputy sheriff's badge, credit cards, Mosley's wallet and flat badge wallet, binoculars taken from Mosley's car, and Mosley's sunglasses and reading glasses.

### Interview with Ashli Winters

On March 5, 2009, Detectives Findley and Miller interviewed Ashli Winters at the police department. Findley testified they never shouted at or threatened her. At the beginning of the interview, Winters said she had seen a news report about the barbershop robbery on television, and she knew the police were looking for her. However, Winters told the detectives that she had been at a friend's house the entire day. Detective Miller told Winters that they believed she was holding back information from the police, she was considered a suspect, and she was believed to have harbored and aided the suspects' escape. Miller told Winters that she could go to jail for that offense, and she could lose custody of her children. Winters became upset, but she was reluctant to get involved and did not want to testify. She indicated that she had a close relationship with Harris.

Detective Findley testified the police had released the names of Patrick Harris and "Carlos Cruz," later corrected to "Carlos Ruiz," to the media as possible suspects. However, the detectives never gave Winters any information about the suspects' nicknames or the type of property stolen, and this information had not been released to the media. During the interview with Winters, she mentioned "No Sense" and "A–Loc." She described Harris's hooded sweatshirt. Winters told the detectives that she dropped off defendant and Harris a couple of blocks away from the barbershop, and she told them about the conversation between the two suspects when she later picked them up. Winters revealed the time and location where she picked up the two suspects later that afternoon. Winters volunteered that she knew jewelry had been stolen during the robbery and gave detailed descriptions of some of the pieces.

The black wool cap found under the driver's seat of the stolen car was

subsequently analyzed by a criminalist, who determined that it contained the DNA of at least three people: one major DNA contributor and two minor DNA contributors. The criminalist determined defendant was a major contributor to the DNA profile on the cap. The other contributors were not determined. DNA tests were inconclusive as to whether Harris was a contributor. There was a possibility that a female could be a minor contributor.

In April 2009, a few weeks after the robbery, Mosley's handgun was found during a traffic stop of an unrelated vehicle. A male and female were in the car, and the female had some relation to a gang.

### TESTIMONY OF THE GANG EXPERT

Bakersfield Police Officer Josh Finney testified as the prosecution's gang expert. He had been with the police department for six years and worked in the gang unit for three and one-half years. He focused most of his attention on the ESC, and had been involved in hundreds of arrests and contacts involving members of the ESC. He had testified as a gang expert more than 10 times and over half of those cases involved the ESC.

### The East Side Crips

Finney testified the ESC was a criminal street gang in Bakersfield and had hundreds of members. The ESC claimed royal blue and used the letters "E–S–C" as identifying marks. Finney explained that within the ESC, there were subsets based on streets or geographic areas within the traditional boundaries of the ESC. The ESC was "like an umbrella with several groups underneath it." The 11th Street Project Crips, Stroller Boy Crips, and Lakeview Gangster Crips were subsets of the ESC.

Finney explained that the ESC's traditional territory included Key Barbershop, McNew Court, and the apartment building at 900 Feliz Drive, where the robbery proceeds were found. Winters had dropped off defendant and used Harris at Miller Street, which was near the border of ESC territory. Feliz Drive was heavily frequented by members of the ESC. There had been shootings at that location, and officers had made "countless arrests" there for narcotics and firearms offenses. The hand sign for the Stroller Boy Crips was an upside down "F," representing Feliz.

The 11th Street Project Crips claimed the housing area along East California and East 10th and 11th Streets. That subset used the numbers 11 or 1100 "P–J–C" as identifying marks, and "900" representing the 900 block of Feliz Drive.

Finney testified that based on his investigations, the primary activities of the ESC included murders, assaults with deadly weapons, assaults, robberies, carjackings, and narcotics possession and sales.

### Predicate offenses

Finney testified he was familiar with two predicate offenses involving members of the ESC. On May 7, 2006, Meko Seward, a Country Boy Crip, was shot and killed by Anthony Taylor, a member of the ESC, after they had an altercation. Taylor was convicted of murder and attempted murder with gang enhancements and sentenced to life without parole plus 25 years.

Finney testified that on July 11, 2005, Jimmy Gray, an ESC, entered Jalisco Jewelers with three other members of the ESC. They committed an armed robbery and took $13,000. Gray pleaded guilty to robbery with gang enhancements and was sentenced to 16 years.

**Patrick Harris**

Officer Finney testified to his opinion that at the time of the barbershop robbery, Patrick Harris was associated with the ESC and the 11th Street Project Crips. Harris's gang moniker was "Lil No Sense." On May 2, 2008, Finney arrested Harris on a warrant. Harris identified himself as an ESC and said he was from the projects. Harris had the number "1" tattooed under each eye, signifying the 11th Street Project Crips. He had other tattoos on his body indicating membership in the ESC.

**Defendant**

Finney also testified to his opinion that defendant was an active member of the ESC at the time of the barbershop robbery. Defendant had numerous contacts with the police while with other members of the ESC; he previously admitted to being a member of the ESC; he had distinctive gang tattoos; an older member of the ESC identified defendant as a member; and defendant called other gang members from jail.

Defendant appeared to be Hispanic. Finney explained that while most members of the ESC were African–American, the gang also had members who were Hispanic, Asian, or Caucasian.

Finney testified about numerous contacts between defendant and the officers from the gang unit, which occurred from 2005 to 2008, where defendant was found either in residences or in the presence of other members of the ESC.

On October 29, 2008, Finney and his partner encountered defendant with other known members of the ESC. Defendant admitted to being an active member of the ESC. Defendant said his moniker was "Lil A–Loc," and that he received his moniker from Adam "A–Loc" Maya, because both defendant and Maya were Hispanic members of the ESC.

Finney testified defendant also said, "'Hell, yeah, I'm East Side.'" Defendant was "very open and sounded proud when saying he was an active member" of the ESC. Defendant said he did not grow up within the gang's traditional boundaries, but he went to school with other members of the ESC. Defendant said he was never jumped into the gang, but he just started to hang around with them. Defendant also admitted he was from the 11th Street projects.

In November 2008, Finney and other gang officers were serving an arrest warrant at the residence of another known member of the ESC. Defendant was present with other members of the ESC. Tierre Hester, Sr., an older member of the ESC was also present, and said that everyone at the house was a member of the ESC.

Finney testified that defendant lived nearly five miles outside the gang's traditional boundaries, but he was regularly contacted within the ESC boundaries, and with ESC members, which showed that he went out of his way to associate with the ESC.

Defendant's tattoos included an "E" on his left calf and an "S" on his right calf. He also had a cross with "RIP" and "A Loc" on his left arm, referring to Adam Maya, who had died. Defendant had admitted his gang moniker was "Lil A–Loc," which was derived from Maya's nickname. Finney explained that adopting a dead gang member's moniker was something that had to be earned. Maya had been a popular and respected member of the ESC, and a gang member had to "put in work or show his devotion to the gang in order to use that nickname."

Finney further testified that from April 2009 to June 2009, defendant was in the local jail, and his telephone calls were monitored. During one call, defendant stated, "East Side Crip 1100." Finney explained that "1100" was one of the symbols used by members of the ESC to refer to the 1100 block of the 11th Street Project Crips. Defendant also said, "East all the time," which was a greeting used by ESC members. Defendant said, "Js up," which referred to the 11th Street Project Crips, because they wore prominent baseball caps for the Toronto Blue Jays, with the "J" representing the projects. Defendant also talked about "Crippin," which Finney explained meant "just living the Crip life style, being a Crip."

***Hypothetical questions*** [N.7]

> [N.7] As we will explain in issues III, IV, and V, post, defendant contends the court should have granted his objections to the nature of the prosecutor's hypothetical questions and Officer Finney's responses.

The prosecutor asked Officer Finney a series of hypothetical questions:

> "An armed robbery of a business. Victims inside the business, there are a few of them, more than two. And two robbers come. They are completely—they have masks on and are covered up so they cannot be otherwise identifiable, armed with a firearm. They take money and jewelry from the victims and keys, take a car, and flee from the site and dump the car, flee to another site, and then move from that sit or are picked up from that site and driven out of the area, and are dropped off at a last location, all of the various locations being with gang territory, and the items being taken include a gun, money, jewelry, car. [¶] Assuming gang culprits are the robbers, how would that benefit, it at all, the gang?"

Defense counsel objected to an improper hypothetical. The court overruled the objection. Finney responded:

> "An armed robbery, as such, would [benefit] the gang in a couple of ways. The first and most obvious would be the items taken, some type of monetary gain, the jewelry, money, and firearm taken. The way I'd best like to describe it is it's not like these guys go back to a hiding spot and divvy up what they have taken amongst all the members of the gang. It benefits the gang in a less obvious way, as far as the gun can be passed around to be used by other members, by these two members receiving some type of income or some monetary gain, they are able to purpose vehicles, buy things for other members of the gang—"

Defense counsel again objected as speculation. The court overruled the objection. Finney continued:

> "A good way to describe it is when a kid is growing up, if they don't receive [an] allowance, they still benefit from their parents having a job.

9

Even though they are not directly receiving money, they still benefit from the parent having a job."

The court overruled defense counsel's objection for an improper analogy.

The prosecutor asked Finney to explain the "trickle-down" effect. Finney testified:

"[T]he trickle-down effect is that, by this one gang member receiving money and being able to have a place to live or a vehicle, other members can hang out at their house or stay at their house, drive their vehicle, use their items. That's the trickle-down effect where they are not dividing a couple hundred dollars amongst several hundred members. It's the trickle-down effect in that the other members of the gang benefit from that member gaining that money or that jewelry."

The court overruled defense counsel's foundational and speculation objections.

The prosecutor asked Finney about the impact of such a crime on the community. Finney explained that no one would be afraid of a gang that did not use guns or weapons. By using a firearm during a robbery and putting everyone on the ground at gunpoint, "citizens in that area are going to be afraid of this gang, because they know that they possess firearms, that they are out there using them. And, also, rival gangs hear of crimes that this gang is committing with the firearms. And that also affects them."

The prosecutor continued with the hypothetical question:

"Q. Add to the hypothetical ... that the individual robbers do not declare, during the course of the robbery, a membership in the gang. They do not identify themselves verbally or otherwise as to the specific gang member. [¶] Does that militate against it being a gang-related event?

"A. No, absolutely not. There is no need or reason to do it. It's deep within the traditional boundaries and the stronghold of the East Side Crips. It's a given that if it's a gang committing this crime, that it's East Side Crips."

Defense counsel moved to strike for facts not in evidence. The court overruled the objection.

The prosecutor asked Finney whether his opinion would change if "the individual perpetrators or suspects are not found in possession of stolen property by a law enforcement [officer] when they are contacted by law enforcement." Finney said no and explained:

"I've witnessed a suspect running from a scene with part of the loss of what they took, and chased that suspect for a block or two. And when I eventually caught him, I found they were no longer in possession. And I could not find what they had taken or where they had thrown it. [¶] So the fact that there was a month that had passed and the suspects were contacted or arrested several states [sic] away had no bearing on the facts—"

Defense counsel objected for facts not in evidence and prejudice. The court sustained the objection.

The prosecutor continued with his hypothetical questions and the following

10

exchange ensued:

> "Q. As to the last, in reference to almost a month later and suspect contacted several states [sic ] away, who are you referring to?
>
> "[DEFENSE COUNSEL]: Objection. Relevance. Move to strike.
> "THE COURT: Sustained.
>
> "Q. Do you know, with regard to the defendant, when—[¶] And just answer 'yes' or 'no.' [¶]—[W]hen and where he was arrested?
>
> "[DEFENSE COUNSEL]: Objection. Relevance.
>
> "THE COURT: Overruled.
>
> "[FINNEY]: Yes.
>
> "[Q.] Does that have any significance with regard to your testimony in this regard?
>
> "A. Not really."

The prosecutor ended his direct examination questions.

### Cross-examination of expert

On cross-examination, defense counsel elicited testimony from Finney that he did not know whether defendant knew any of the gang members who had been convicted in the predicate offenses. Finney admitted that he did not arrest defendant when he found defendant in the company of other members of the ESC. Finney also admitted that he did not know whether defendant had been jumped into the ESC, and that someone could be an "associate" or "wannabe" just by hanging out with other gang members.

In response to further defense questions, Finney testified that Jonathan Lee was Patrick Harris's half-brother, Lee was a member of the ESC, Harris and Lee committed a robbery/homicide together about six weeks before the robbery of the barbershop, and defendant was not involved in that offense. [N.8]

> [N.8] As we will explain in issue I, post, defendant was initially charged in a consolidated information which included murder, burglary, and robbery charges against Harris, Lee, and Landon Reynolds, based on a home invasion which occurred in April 2009. Defendant was never alleged to have participated in the home invasion.

Finney conceded he did not have any personal information as to the application of the "trickle-down" theory to the ESC from the barbershop robberies, and acknowledged that the stolen car was abandoned. Finney also conceded that the jewelry and/or gun taken during the barbershop robbery were not given to other members of the ESC. However, Finney testified that Mosley's gun was later found in a vehicle, and the occupants of the vehicle were connected to the ESC.

### Redirect examination testimony

On redirect examination, the prosecutor again asked Finney hypothetical

11

questions. In response, Finney testified that if a gang member committed a robbery in his own territory, against people who were not in the gang, "there is no need for him to say, 'This is such and such gang committing this robbery.' It doesn't benefit him in any way." Finney explained that a gang member would identify himself if he was involved in a conflict with a person from a rival gang. "But just committing a robbery of citizens, there is no need for it."

Finney clarified that Mosley's stolen gun was found on April 7, 2009, during the traffic stop of a vehicle. A male and female were in the car, and the female had some relation to a gang. Mosley's stolen car was abandoned in the territory of the ESC, and the two suspects ran to another location within the traditional boundaries of the ESC.

### *DEFENSE EVIDENCE*

Defendant did not testify.

Detective Kennemer testified that about 30 minutes after the barbershop robbery, he took Mosley to Feliz Drive for a show-up on Alton Gunter and Terrance Ellis, who had been in the apartment. Mosley could not positively identify anyone.

Detective Dossey testified that Victoria Campbell described the two running suspects as African–American males.

Officer Ryan Williams testified that on April 6, 2009, he conducted a traffic stop on a vehicle driven by Brandon Jackson, an African–American. Mosley's stolen gun was found under the driver's seat.

A criminalist testified that clothing and DNA samples were taken from Terrance Ellis and Alton Gunter as part of the investigation into the barbershop robbery. Another criminalist testified that a latent fingerprint for Brandon Jackson was found on the stolen firearm.

Ruiz, 2012 WL 4076669, at *1–9.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

2    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

3    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

4    and is therefore governed by its provisions.

5         B.       Legal Standard of Review

6         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

7    the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

8    that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

9    determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

10   based on an unreasonable determination of  the facts in light of the evidence presented in the State

11   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

12   Williams, 529 U.S. at 412-413.

13        A state court decision is "contrary to" clearly established federal law "if it applies a rule

14   that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

15   of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

16   different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-

17   406 (2000).

18        In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

19   explained that an "unreasonable application" of federal law is an objective test that turns on

20   "whether it is possible that fairminded jurists could disagree" that the state court decision meets

21   the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an

22   *unreasonable* application of federal law is different from an *incorrect* application of federal

23   law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a

24   writ of habeas corpus from a federal court "must show that the state court's ruling on the claim

25   being presented in federal court was so lacking in justification that there was an error well

26   understood and comprehended in existing law beyond any possibility of fairminded

27   disagreement."  Harrington, 131 S.Ct. at 787-788.

28        The second prong pertains to state court decisions based on factual findings.  Davis v.

13

1   Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under §

2   2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

3   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

4   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

5   U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable

6   when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see

7   Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543

8   U.S. 1038 (2004).

9          To determine whether habeas relief is available under § 2254(d), the federal court looks to

10  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

11  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

12  2004).  "[A]lthough we independently review the record, we still defer to the state court's

13  ultimate decisions."   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

14         The prejudicial impact of any constitutional error is assessed by asking whether the error

15  had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

16  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120

17  (2007)(holding that the Brecht standard applies whether or not the state court recognized the error

18  and reviewed it for harmlessness).

19         C.     Review of Claims

20         The instant petition presents the following grounds for relief: 1) The conviction for

21  criminal street gang activity is unsupported by sufficient evidence; 2) The trial court abused its

22  discretion in denying motions to bifurcate the trial on the gang issues; 3) The trial court erred by

23  allowing the use of case- and defendant-specific hypotheticals; 4) The trial court erred in defining

24  the immediate presence element of carjacking, as distinct from robbery; 5) The trial court erred in

25  failing to define the technical terminology: "in association with a criminal street gang"; 6) The

26  instructions on gang evidence and enhancements were erroneous; 7) The trial court erred in

27  instructing the jury with CALCRIM No. 373; 8) The trial court erred in instructing the jury with

28  CALCRIM No. 376; 9) The trial court erred in denying Petitioner's motion to dismiss the case

based on statutory speedy trial violations; 10) The cumulative effect of the errors denied Petitioner of a fair trial; and 11) The trial court erred in calculating Petitioner's presentence credits.

### 1.   Insufficient Evidence of Criminal Street Gang Activity

#### a.   State Court Opinion

Petitioner first claims that the evidence was insufficient to support the criminal street gang offense and enhancements.  The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a reasoned decision.

The appellate court rejected the claim as follows:

Defendant contends his conviction in count XI for the gang substantive offense must be reversed (§ 186.22, subd. (a)), and the gang enhancements found true as to the carjacking and robbery counts must be stricken (§ 186.22, subd. (b)), because there is insufficient evidence to support these findings. Defendant argues that evidence of his gang membership was insufficient to support either count XI or the gang enhancements, and the evidence showed that he could have committed the offenses for a personal reason.

#### A.  *Substantial evidence*

In assessing the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin, supra*, 18 Cal.4th at p. 331; *People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

The same substantial evidence standard applies when reviewing a jury's true finding on gang enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)

It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. (*People v. Hernandez, supra*, 33 Cal.4th at pp. 1047–1048; *People v. Valdez, supra*, 58 Cal.App.4th at p. 506; *People v. Ferraez, supra*, 112 Cal.App.4th at p. 930.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*Albillar, supra*, 51 Cal.4th at p. 63.) The credibility and weight of expert testimony is for the trier of fact to determine. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467.)

#### B.  *The gang substantive offense*

15

In count XI, defendant was convicted of the gang substantive offense in violation of section 186.22, subdivision (a), which states that "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment ...." (§ 186.22, subd. (a), italics added.)

Defendant contends his conviction for the substantive gang offense is not supported by any substantial evidence that he had the personal intent to benefit the ESC when he committed the carjacking and robberies in this case. However, these identical challenges to section 186.22, subdivision (a) were considered and rejected in *Albillar*. In that case, three defendants took turns raping the victim while the others either assisted or stood nearby. Defendants were related to each other, and they were also members of the Southside Chiques gang. (*Albillar, supra*, 51 Cal.4th at pp. 52–53.) They were convicted of forcible rape in concert, forcible sexual penetration in concert, and the gang substantive offense, and were found to have committed the offenses for the benefit of a criminal street gang. (*Id.* at p. 50.)

*Albillar* clarified that "a violation of section 186.22(a) is established when a defendant actively participates in a criminal street gang with knowledge that the gang's members engage or have engaged in a pattern of criminal activity, and willfully promotes, furthers, or assists in *any felonious criminal conduct* by gang members." (*Albillar, supra*, 51 Cal.4th at p. 54, italics in original.) *Albillar* rejected the defendants' challenges to their convictions for the substantive gang offense, based on their argument that the phrase "any felonious criminal conduct," in section 186.22, subdivision (a), referred only to gang-related felonious criminal conduct. (*Albillar, supra*, 51 Cal.4th at p. 59.)

"The gravamen of the substantive offense set forth in section 186.22(a) is active participation in a criminal street gang. [T]he phrase 'actively participates' reflects the Legislature's recognition that criminal liability attaching to membership in a criminal organization must be founded on concepts of personal guilt required by due process: 'a person convicted for active membership in a criminal organization must entertain "guilty knowledge and intent" of the organization's criminal purposes.' [Citation.] Accordingly, the Legislature determined that the elements of the gang offense are (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.] *All three elements can be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related.*" (*Albillar, supra*, 51 Cal.4th at pp. 55–56, italics added.)

The "plain language" of section 186.22, subdivision (a) "thus targets felonious criminal conduct, not felonious gang-related conduct." (*Albillar, supra*, 51 Cal.4th at p. 55.)

"[T]here is nothing absurd in targeting the scourge of gang members committing any crimes together and not merely those that are gang related. Gang members tend to protect and avenge their associates. Crimes committed by gang members, whether or not they are gang related or committed for the benefit of the gang, thus pose dangers to the public and

difficulties for law enforcement not generally present when a crime is committed by someone with no gang affiliation. 'These activities, both individually and collectively, present a clear and present danger to public order and safety....' [Citation.]" (*Albillar, supra*, 51 Cal.4th at p. 55.)

*Albillar* thus concluded that the defendants' convictions for the substantive gang offense were supported by substantial evidence, and their challenges were without merit, because the phrase "any felonious criminal conduct" in section 186.22, subdivision (a), was not limited to gang-related felonious conduct. (*Albillar, supra*, 51 Cal.4th at p. 59.)

### 1.  Analysis

In the instant case, as in *Albillar*, we similarly conclude that defendant's substantial evidence challenges to his conviction in count XI, the substantive gang offense, are without merit. In order to establish a violation of section 186.22, subdivision (a), the prosecution was not required to prove the felonious criminal conduct which defendant promoted, furthered, or assisted during the barbershop robberies was gang related.

### C.  The gang enhancements

Defendant contends the jury's findings on the gang enhancements are not supported by substantial evidence that he "specifically harbored the requisite intent" when he committed the underlying offenses. Defendant argues that evidence of his gang membership, standing alone, was insufficient to establish that the underlying offenses were gang related.

As to count V, carjacking, and counts VI through IX, robbery, the jury found true the gang enhancements pursuant to section 186.22, subdivision (b). To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, *or* in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1), italics added.)

As to the first element, "[n]ot every crime committed by gang members is related to a gang." (*Albillar, supra*, 51 Cal.4th at p. 60.) However, *Albillar* acknowledged that the gang-related requirement for the enhancement may be shown by evidence indicating that several defendants "came together as gang members" to commit the offense, or that the offense could benefit the gang by, for example, elevating the gang's or gang members' status or advancing the gang's activities. (*Albillar, supra*, 51 Cal.4th at pp. 62–63, italics omitted; see *Gardeley, supra*, 14 Cal.4th at p. 619.) If the evidence is sufficient to establish the crime was committed in association with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (See, e.g., *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

As for the second element of specific intent, it does not require "that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar, supra*, 51 Cal.4th at p. 67, italics in original.) "[S]pecific intent to *benefit* the gang is not required." (*Morales, supra*, 112 Cal.App.4th at p. 1198, italics in original.) The specific intent element "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced."

(*Albillar, supra*, 51 Cal.4th at p. 66, italics in original.) The scienter requirement is "the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members." (*Albillar, supra*, 51 Cal.4th at p. 65, italics in original.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra*, 51 Cal.4th at p. 68.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

In *Albillar*, the California Supreme Court addressed defendants' substantial evidence challenge to the gang enhancements found true as to the sexual assault offenses in that case. Defendants argued the sexual assaults were not "gang-related" because the defendants were related to each other, they lived together, and it was conceivable that "'several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' [Citation.]" (*Albillar, supra*, 51 Cal.4th at pp. 59–60, 62.)

*Albillar* rejected defendants' arguments and found there was substantial evidence to support the gang enhancements for two reasons: the offenses were committed in association with gang members, and the offenses were committed for the benefit of the gang. (*Albillar, supra*, 51 Cal.4th at p. 60.) "The record supported a finding that [the] defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (*Ibid*.) In particular, the court cited expert testimony about how gang members earn respect and status by committing crimes with other members, and that gang members choose to commit crimes together in order to increase their chances of success and to provide training for younger members. (*Id*. at pp. 60–61.)

*Albillar* concluded that defendants' conduct, where each participant assisted the others without a word being spoken, and each could rely on the silence of the others and group intimidation of the victim, "exceeded that which was necessary to establish that the offenses were committed in concert." (*Albillar, supra*, 51 Cal.4th at p. 61.)

> "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police and on the gang's reputation to ensure that the victim did not contact the police." (*Id*. at pp. 61–62.)

*Albillar* also found substantial evidence the crimes were committed to benefit the gang. (*Albillar, supra*, 51 Cal.4th at p. 63.) The court cited the gang expert's testimony, that "'[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit. They're putting notches in their reputation. When these members are doing that, the overall entity benefits and strengthens as a result of it.' Reports of such conduct 'rais[e] the[ ] level of fear and intimidation in the community.'" (*Ibid*.) *Albillar* explained:

18

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22[, subd.] (b)(1)." (*Ibid*.)

### *1. Analysis*

As in *Albillar*, defendant similarly argues that there is insufficient evidence to support the gang enhancements in this case when someone who happens to be a gang member commits felonious offenses for personal reasons. Defendant acknowledges the holding in *Albillar*, but argues there is no evidence that the underlying offenses in this case were committed with the requisite specific intent, or for the benefit of, at the direction of, or in association with the ESC. Defendant further argues Officer Finney's "bare speculation" was insufficient to satisfy these elements of the gang enhancement.

Defendant's attack on Officer Finney's expert opinion as bare speculation is meritless. Finney testified to his extensive personal experience investigating the criminal activities of the ESC and interviewing their members. As explained in *Vang*, the prosecutor's hypothetical questions were appropriate. In addition, the questions were rooted in the facts shown by the evidence and were not based on "'assumptions of fact without evidentiary support....'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)

As to the first element of the enhancement, the jury could have reasonably inferred the carjacking and robberies in this case were gang-related from the very fact that defendant committed the charged crimes in association with a fellow gang member. (*Morales, supra*, 112 Cal.App.4th at p. 1198; *Albillar, supra*, 51 Cal.4th at p. 62.) "The crucial element [of a gang allegation] requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in association with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime." (*Morales, supra*, 112 Cal.App.4th at p. 1198.)

This is not a close case, given the overwhelming evidence that defendant and Harris were members of the ESC when they committed the barbershop robberies and carjacking together. Active participation is defined as "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castaneda* (2000) 23 Cal.4th 743, 747.) It does not require that a person "'devote all, or a substantial part of his time and efforts' to the gang. [Citation.]" (*Id*. at p. 752.) Officer Finney testified in extensive detail, and without contradiction, that defendant and Harris were both members and active participants in the criminal activities of the ESC and its related subsets.

As acknowledged by *Albillar*, not every crime committed by gang members is gang-related for purposes of section 186.22, subdivision (b), and the mere fact that gang members commit a crime together does not necessarily mean the crime is gang-related for purposes of the gang enhancement. (*Albillar, supra*, 51 Cal.4th at pp. 60, 62.) As *Albillar* also acknowledged, however, there was substantial evidence to support the gang enhancements because the three defendants in that case "came together as gang members to attack [the victim] and, thus ... they committed [the sexual assaults] in association with the gang." (*Id*. at p. 62.) In this case, defendant and Harris similarly came together in ESC territory to commit a carjacking and multiple robberies, offenses which Officer Finney identified as within the primary activities of the ESC, and which would promote fear of the

1    gang in the territory.

2    Thus, the crimes were committed in association with the gang because the record
     supporting a finding that defendant and Harris "relied on their common gang
3    membership and the apparatus of the gang in committing the [crimes] against [the
     victims]." (*Albillar, supra*, 51 Cal.4th at p. 60.) In addition, the crimes were
4    committed for the benefit of the gang because, as explained by Officer Finney, the
     armed robberies, in the midst of gang territory, promoted fear of the gang.
5    (*Albillar, supra*, 51 Cal.4th at p. 63.)

6    As for the second element of the enhancement, based on the evidence that
     defendant "intended to and did commit the charged felon[ies] with known
7    members of a gang, the jury may fairly infer that the defendant had the specific
     intent to promote, further, or assist criminal conduct by those gang members."
8    (Albillar, supra, 51 Cal.4th at p. 68.) Defendant and Harris committed the
     carjacking and robberies together, in a barbershop that was within the turf of the
9    ESC. By their own admissions, they were actively associated with the ESC and its
     subsets. When they stole the car, they drove straight into the heart of ESC territory,
10   abandoned the stolen vehicle, and fled to an apartment building which had long
     been associated with other members of the ESC. When Winters picked them up,
11   they told her to drive into another section of ESC turf.

12   We thus conclude there is substantial evidence to support defendant's conviction in
     count XI for the substantive gang offense, and the gang enhancements found true
13   as to the carjacking and robbery counts. [N.10]

14            [N.10] We note that throughout the briefing in this case, defendant cites to
              *Garcia v. Carey* (9th Cir.2005) 395 F.3d 1069, and *Briceno v. Scribner*
15            (9th Cir.2009) 555 F.3d 1065, in support of his challenges to the gang
              findings and the instructions given in this case. *Albillar* rejected the Ninth
16            Circuit's interpretation of the gang offense and gang enhancement
              contained in those cases. (*Albillar, supra*, 51 Cal.4th at p. 66.)
17

18   Ruiz, 2012 WL 4076669, at *30–35.

19            b.    Federal Standard

20           The law on sufficiency of the evidence is clearly established by the United States Supreme

21   Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

22   307, the test on habeas review to determine whether a factual finding is fairly supported by the

23   record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the

24   prosecution, any rational trier of fact could have found the essential elements of the crime beyond

25   a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781

26   (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a

27   reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.

28   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

                                                    20

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 3-4.

c.    Analysis

Petitioner argues that there was insufficient evidence to support the gang offense, because the evidence did not support the finding that he had the personal intent to benefit the ESC gang. According to Cal. Penal Code § 186.22(a), "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" is guilty of the substantive gang offense.

The state court found that the statute did not require proving that the felonious activities

21

1  Petitioner participated in at the barbershop were gang-related.  The state court determined that the

2  language in § 186.22(a) did not require commission of "gang-related" felonious criminal conduct,

3  but that "any" felonious criminal conduct sufficed.  This Court is bound by the state court's

4  interpretation of state law.  Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009).  There was

5  ample evidence that Petitioner assisted in the felonious criminal acts at the barbershop.

6  Therefore, his claim fails.

7         Petitioner also argues that the evidence did not support the gang enhancements because

8  there was insufficient evidence that he specifically harbored the requisite intent when he

9  committed the underlying offenses.  Under § 186.22(b), to establish a gang enhancement, the

10  prosecution had to prove: 1) that the crime was "committed for the benefit of, at the direction of,

11  or in association with any criminal street gang"; and 2) that the defendant had "the specific intent

12  to promote, further or assist in any criminal conduct by gang members. . . ."  Cal. Penal Code §

13  186.22(b).

14         The state court considered the definition and found it was clear that the evidence need

15  only establish that the crime was committed in association with a gang.  It was not necessary to

16  establish that the crimes were committed for the benefit or at the direction of a gang.  Here, there

17  was ample evidence from which a jury could determine that Petitioner committed the underlying

18  offenses in association with a gang.  As to the second element, again the state court looked to the

19  plain language and found that it was not necessary for the prosecution to show defendant bore the

20  specific intent to promote, further, or assist a gang; rather, it was sufficient under the definition to

21  establish that the defendant bore the specific intent to promote, further or assist criminal conduct

22  by gang members.  There was substantial evidence from which a jury could find that Petitioner

23  intended to promote, further, or assist his fellow gang member in the underlying criminal acts.

24  Therefore, this claim also fails.

25         2.    Bifurcation

26              a.    State Court Opinion

27         Petitioner contends that the trial court violated his federal due process rights by denying

28  his motions to bifurcate the trial as to the gang issues.  In the last reasoned decision, the appellate

court rejected the claim as follows:

### A.  Motions in limine

During the pretrial motions in limine for defendant's jury trial, defendant moved to bifurcate the gang issues and dismiss gang allegations. Defendant's motion was based on the prosecution's alleged failure to disclose exculpatory evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), the issue of admissibility of the gang expert's testimony, and the sufficiency of the evidence for the gang allegations to go to trial. Defendant did not move to sever count XI, the gang substantive offense charged against him, from counts V through X, the carjacking and robbery charges.

In opposition, the prosecution argued the gang enhancements should not be bifurcated because defendant was also charged with the gang substantive offense. The prosecution further argued the gang evidence was intertwined with the other charged offenses based on the theory that defendant's gang membership motivated him to commit the barbershop robberies with another gang member, the reluctance of witnesses to cooperate and testify, and the identification of defendant based on his gang moniker.

### B.  The court's ruling

Prior to trial, the court heard argument on defendant's motion in limine and defendant's Brady allegations. Defendant did not address bifurcation. However, the prosecution argued the gang allegations should not be bifurcated for the reasons stated in its opposition.

The court denied defendant's motion in limine as to the *Brady* allegations, the admission of the gang expert's opinion, and the sufficiency of the evidence to go to trial. In ruling on another defense motion, however, the court addressed both bifurcation and severance as to the gang evidence:

> "The gang evidence being proferred is relevant in this case to prove I.D. and motive and intent, and then we have a charge in count 11 of [section] 186.22(A), and there is no reason to sever that charge from the other charges. The evidence it does [*sic*] to an issue certainly of efficiency, and the cumulative aspect has been addressed. [¶] So we have both gang enhancement allegations and a charged offense relying upon for the most part, the same evidence and gang allegations are inextricably intertwined with the counts alleged, and the gang evidence may to some extent come in on issues of credibility; but we won't know until we hear from witnesses."

### C.  Motion for new trial

As part of defendant's motion for new trial, he argued there was insufficient evidence to support his conviction on count XI, the gang substantive offense, and the jury's findings on the gang enhancements. He also argued the gang expert's opinions were speculative. He did not argue the court should have granted motions for bifurcation and/or severance of the gang issues. The court denied the motion for new trial.

### D.  Forfeiture

As a preliminary matter, the parties dispute whether defendant moved to bifurcate

or sever the gang issues in this case or raised the issue in his new trial motion. The People assert that while defendant's pretrial motion included bifurcation in the title, the defendant never moved to bifurcate the gang evidence or sever count IX, the substantive gang offense, he never raised these issues in his new trial motion, and he has forfeited appellate review of both issues. Defendant insists he preserved all issues.

Defendant's pretrial and new trial motions did not raise the specific issues which he now raises on appeal. During the pretrial rulings, however, the superior court clearly believed that both bifurcation and severance of the gang issues had been raised, and addressed both issues. Thus, we will address the court's rulings on those two issues.

### E. Bifurcation

A trial court has broad discretion to control the conduct of a criminal trial. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) The court's power to bifurcate the trial of a gang enhancement from the trial of the substantive offense is implied in section 1044. (*Hernandez, supra*, 33 Cal.4th at p. 1048.)

*Hernandez* explained that the need to bifurcate gang allegations is often not as compelling as the bifurcation of prior conviction evidence. (*Hernandez, supra*, 33 Cal.4th at pp. 1048–1049.) "A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation. [Citation.]" (*Id.* at p. 1048, italics in original.) While the Legislature has "recognized the potential for prejudice when a jury deciding guilt hears of a prior conviction ... [n]othing in section 186.22 suggests the street gang enhancement should receive special treatment of the kind given prior convictions. [Citations.]" (*Id.* at p. 1049.)

"[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1049–1050.)

In moving for bifurcation, the defense "'must clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Hernandez, supra*, 33 Cal.4th at p. 1051.) Bifurcation may be necessary where the predicate offenses offered to establish the pattern of criminal activity are "unduly prejudicial," or where some of the other gang evidence may be "so extraordinarily prejudicial, and of so little relevance to guilt," that it may influence the jury to convict regardless of the defendant's guilt. (*Id.* at p. 1049.)

We review the trial court's denial of a motion to bifurcate for abuse of discretion. (*Hernandez, supra*, 33 Cal.4th at p. 1048.) The trial court's discretion to deny a motion to bifurcate the trial of a charged gang enhancement is broader than its discretion to admit gang evidence when a gang enhancement is not charged. (*Id.* at

p. 1050.) When the evidence sought to be severed is related to a charged offense, the burden is on the defendant to clearly establish a substantial danger of prejudice requiring bifurcation. (*Ibid.*)

### 1. Analysis

The trial court did not abuse its discretion when it denied bifurcation of the gang allegations and evidence in this case. The gang evidence was necessarily intertwined with the charged offenses as to several relevant issues, particularly motive and identity. "Motive is always relevant in a criminal prosecution." (*People v. Perez* (1974) 42 Cal.App.3d 760, 767.) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.] '"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 (*Samaniego*).)

Defendant and Harris were members of the ESC, they were alleged to have committed the barbershop armed robberies and carjacking together, they committed the offenses in the traditional territory of the ESC, the stolen car was found within ESC territory, they fled to a particular street routinely frequented by members of the ESC, and several of the stolen items were found in an apartment located in the ESC area. In addition, some of the witnesses identified one of the robbery suspects by the nickname of "A–Loc," defendant's gang moniker.

### F. Severance

In addition, defendant was charged with count XI, the substantive gang offense, based on his robbery and carjacking in this case. As relevant to the charges in this case, "to entirely eliminate the gang evidence would have required a severance ... of the street terrorism count and the bifurcation of the gang enhancements." (*People v. Burnell* (2005) 132 Cal.App.4th 938, 947.)

"In the context of severing charged offenses, we have explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.] When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Citation.]" (*Hernandez, supra*, 33 Cal.4th at p. 1050.)

As with bifurcation, the court's ruling on a severance motion is reviewed for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27–28.) "Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon

the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*Ibid.*)

"The analogy between bifurcation and severance is not perfect. Severance of charged offenses is a more inefficient use of judicial resources than bifurcation because severance requires selection of separate juries, and the severed charges would always have to be tried separately; a bifurcated trial is held before the same jury, and the gang enhancement would have to be tried only if the jury found the defendant guilty. But much of what we have said about severance is relevant here, *and we conclude that the trial court's discretion to deny bifurcation of a charged gang enhancement is similarly broader than its discretion to admit gang evidence when the gang enhancement is not charged.* [Citation.]" (*Hernandez, supra*, 33 Cal.4th at p. 1050, italics added.)

### 1. Analysis

To the extent defendant moved to sever count XI, the gang substantive offense, the court did not abuse its discretion to deny severance. Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses carries a very heavy burden to "'*clearly establish* that there is a substantial danger of prejudice requiring that the charges be separately tried' " before such a severance can be granted. (*People v. Burnell, supra*, 132 Cal.App.4th at p. 946, italics in original; see § 954.) Defendant failed to do so. The gang evidence was cross-admissible as to motive, identity, and the reluctance of certain witnesses to testify. The substantive street terrorism count required much the same evidence to prove, and was no more potentially inflammatory than the other charges, such that severance would not have been appropriate. (See, e.g., *Hernandez, supra*, 33 Cal.4th at p. 1051.) In addition, the evidence as to count XI, the substantive gang evidence, and the gang enhancements, was not weak. Indeed, as we will discuss in issue V, *post*, the evidence of the gang association, benefit, and motive in this case was particularly strong. And as we will discuss in issue IV, *post*, the jury was correctly instructed on the limited purpose of gang evidence, and we presume the jury followed the instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

### G. Due process

Finally, defendant argues the denial of his motions for bifurcation and/or severance of the gang issues and evidence violated his due process right to a fair trial on the carjacking and robbery charges, because of the alleged "gross unfairness" that resulted from the introduction of the gang evidence in this case.

Defendant's argument is based on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), which held:

"To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible

inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Id*. at pp. 229–230, fn. omitted.)

In *Albarran*, the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. (*Albarran, supra*, 149 Cal.App.4th at pp. 217–220.) The trial court permitted the prosecution to introduce gang evidence to prove defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements were true. Thereafter, the court granted a motion to dismiss the gang allegations for insufficient evidence. (*Id*. at pp. 218–220.)

*Albarran* held that while the trial court may have initially found that defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was completely irrelevant to defendant's motive or the substantive criminal charges. (*Albarran, supra*, 149 Cal.App.4th at p. 217.) The irrelevant evidence included other gang members' threats to kill police officers, descriptions of crimes committed by other gang members and references to the Mexican Mafia prison gang. *Albarran* characterized the irrelevant gang evidence as "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id*. at p. 230, fns. omitted.) *Albarran* also classified this evidence as "overkill," and said it was "troubled" by the trial court's failure to scrutinize the potential prejudice of the gang offense on the substantive charges. (*Id*. at p. 228.) *Albarran* found the irrelevant and prejudicial gang evidence was so inflammatory that it "had no legitimate purpose in this trial," and held admission of that evidence violated defendant's due process rights. (*Id*. at pp. 230–231.)

### *1. Analysis*

The instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran, supra*, 149 Cal.App.4th at p. 232.) In contrast to *Albarran*, defendant was charged with both the gang substantive offense and enhancements. The court did not grant a new trial as to either count XI or the enhancements. As we will explain post, the jury was properly instructed on the limited admissibility of the gang evidence, and the jury's findings on count XI and the gang enhancements are supported by overwhelming substantial evidence. More importantly, Officer Finney's expert testimony regarding the criminal activities of the ESC was not similar to the sensational and prejudicial testimony admitted in *Albarran*. While Finney addressed predicate offenses committed by other members of ESC, his testimony was limited to the essential facts needed by the prosecution to prove the elements of both the gang substantive offense and the enhancements. In addition, Finney never addressed any prior criminal conduct allegedly committed by defendant and/or Harris. Moreover, the gang evidence in this case was no more sensational than the evidence as to the carjacking and robbery charges against defendant, that he committed a brazen daytime armed robbery, during which one of the suspects trained his firearm on

one of the victims and repeatedly threatened to "pop" him if he failed to quickly remove his jewelry.

The court did not abuse its discretion when it denied bifurcation and severance of the gang issues and evidence in this case, and the admission of the gang evidence did not violate defendant's due process rights.

Ruiz, 2012 WL 4076669, at *20–24.

> b.    Federal Standard and Analysis

There is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution.  In United States v. Lane, 474 U.S. 438, 446 n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." However, in Young v. Pliler, the Ninth Circuit stated:

> Lane considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

Young, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir.2008) (unpublished); see also Collins v. Runnels, 603 F.3d 1127, 1132–33 (9th Cir.2010).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Id.  Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that

1    squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established'

2    Supreme Court precedent…and so we must defer to the state court's decision").

3    　　　　Even assuming, arguendo, that the Supreme Court's footnote could be considered clearly

4    established Federal law, no constitutional violation occurred in this case, because the prejudice

5    was not so great as to deny Petitioner his right to a fair trial.  Lane, 474 U.S. at 446, fn. 8.  The

6    gang evidence in this case was highly relevant to several issues including motive, identity, and the

7    reluctance of certain witnesses to testify.  Much of the evidence was cross-admissible for the

8    substantive gang offense and the gang enhancements.  In addition, the jury was instructed on the

9    limited use of the gang evidence.  Moreover, Petitioner fails to establish any prejudice.  Since the

10   gang evidence would have been admissible in the trial on the substantive charges, Petitioner

11   cannot show that bifurcation would have eliminated the purported prejudice, nor that lack of

12   bifurcation altered the outcome in any way.  Accordingly, the state court adjudication was not

13   objectively unreasonable.  For the foregoing reasons, the claim should be rejected.

14   　　　　3.　　　Use of Hypotheticals

15   　　　　　　　a.　　　State Court Opinion

16   　　　　Petitioner next argues that the trial court erred in permitting the use of case- and

17   defendant-specific hypotheticals.  The claim was rejected by the appellate court as follows:

18
19   　　　Defendant argues that the court improperly permitted Officer Finney, the
     prosecution's gang expert, to answer a series of hypothetical questions which
     mirrored the facts in this case. Defendant argues Finney was improperly permitted
20   to respond to "unduly case-and defendant-specific gang hypothetical questions and
     answers" which effectively told the jurors how to decide the disputed gang issues
21   in this case.

22   　　　**A.  Expert testimony in gang cases**

23   　　　It is well settled that expert testimony about gang culture and habits is admissible
     and the type of evidence a jury may rely on to reach a verdict on a gang-related
24   offense or a finding on a gang allegation. (*People v. Gardeley* (1996) 14 Cal.4th
     605, 619 (*Gardeley*); *People v. Valdez* (1997) 58 Cal.App.4th 494, 506; *People v.*
25   *Ferraez* (2003) 112 Cal.App.4th 925, 930.) The subject matter of the culture and
     habits of street gangs meets the criteria for the admissibility of expert opinion
26   because such evidence is sufficiently beyond common experience that the opinion
     of an expert would assist the trier of fact. (*Gardeley, supra*, 14 Cal.4th at p. 617.)
27   Such areas include "testimony about the size, composition or existence of a gang
     [citations], gang turf or territory [citations], an individual defendant's membership
28   in, or association with, a gang [citations], the primary activities of a specific gang
     [citations], motivation for a particular crime, generally retaliation or intimidation

[citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656–657, fns. omitted.)

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter ... upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid.Code, § 802.) Expert testimony may be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and is reliable. (*Gardeley, supra*, 14 Cal.4th at p. 618.) If the threshold requirement of reliability is met, "even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony." (*Ibid.*, italics omitted; see also *People v. Duran* (2002) 97 Cal.App.4th 1448, 1463.) Since Evidence Code section 802 permits an expert witness to "'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley, supra*, 14 Cal.4th at p. 618.)

Thus, an officer testifying as a gang expert, just like other experts, may give testimony that is based on hearsay, including conversations with gang members as well as with the defendant. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324; *Gardeley, supra*, 14 Cal.4th at p. 620; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.) A gang expert's opinion may also be based upon the expert's personal investigation of past crimes by gang members, and information about gangs learned from the expert's colleagues or other law enforcement agencies. (*People v. Sengpadychith, supra*, 26 Cal.4th at p. 324; *Gardeley, supra*, 14 Cal.4th at p. 620; *People v. Vy, supra*, 122 Cal.App.4th at p. 1223, fn. 9.)

**B.  People v. Vang**

"A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence. [Citation.]" (*People v. Gonzales* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.)

At the time of briefing in this case, defendant acknowledged the question of the permissible degree of specificity in gang hypothetical questions was pending before the California Supreme Court. This issue has now been decided. In *People v. Xue Vang* (2011) 52 Cal.4th 1038 (*Vang*), it was alleged the defendants committed felony assault with force likely to commit great bodily injury for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). (*Vang, supra*, 52 Cal.4th at pp. 1041–1042.) The prosecutor presented expert testimony with respect to the history, characteristics and motives of the gang. The prosecutor also asked the expert hypothetical questions which "closely tracked the evidence in a manner that was only thinly disguised." (*Id.* at p. 1041.) The appellate court reversed and held the trial court erroneously allowed the expert to respond to the hypothetical questions. (*Ibid.*)

*Vang* held that the hypothetical questions, and their recitation of the evidence against the defendants, were a proper means of presenting the expert's opinions.

"Use of hypothetical questions is subject to an important requirement. 'Such a hypothetical question must be rooted in facts shown by the

evidence....' [Citations.] A hypothetical question need not encompass all of the evidence. 'It is true that "it is not necessary that the question include a statement of all the evidence in the case. The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question." [Citation.] On the other hand, the expert's opinion may not be based "'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors....'" [Citations.] But, however much latitude a party has to frame hypothetical questions, the questions must be rooted in the evidence of the case being tried, not some other case.

"The reason for this rule should be apparent. A hypothetical question not based on the evidence is irrelevant and of no help to the jury. ' "Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" ' [Citation.] Expert testimony *not* based on the evidence will not assist the trier of fact. Thus, '[a]lthough the field of permissible hypothetical questions is broad, a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced.' [Citation.]

"As applied here, this rule means that the prosecutor's hypothetical questions had to be based on what the evidence showed these defendants did, not what someone else might have done. The questions were directed to helping the jury determine whether *these* defendants, not someone else, committed a crime for a gang purpose. Disguising this fact would only have confused the jury." (*Vang, supra*, 52 Cal.4th at p. 1045, italics in original.)

*Vang* held that hypothetical questions could properly be used to elicit testimony from gang experts, and that such questions "must be rooted in the evidence of the case being tried, not some other case." (*Vang, supra*, 52 Cal.4th at p. 1046.) The court specifically approved the prosecutor's use of hypothetical questions even though the questions only "'thinly disguised'" the evidence. (*Id*. at p. 1046.)

Although approving an expert's express reliance on and consideration of the evidence presented at trial, *Vang* nonetheless carefully reiterated and reaffirmed the rule which prevents an expert from offering an opinion as to a defendant's actual guilt or the actual truth of an alleged enhancement. "'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."' [Citations.]" (*Vang, supra*, 52 Cal.4th at p. 1048.)

*Vang* noted the expert in that case had no personal knowledge as to whether any of the defendants had committed the underlying assault "and if so, how or why; he was not at the scene. The jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault. So he could not testify directly whether they committed the assault for gang purposes. *But he properly could, and did, express an opinion,*

31

*based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose.*" (*Vang, supra*, 52 Cal.4th at p. 1048, italics added.)

*Vang* further held that hypothetical questions which closely track evidence presented at trial and are, as a practical matter, indistinguishable from the case presented against a defendant, are quite distinct from direct opinions about a defendant's guilt or innocence. (*Vang, supra*, 52 Cal.4th at p. 1049.) Unlike questions of guilt or innocence, hypothetical questions do not invade the province of the jury:

"[E]xpect testimony is permitted even if it embraces the ultimate issue to be decided. [Citation.] The jury still plays a critical role in two respects. First, [the jury] must decide whether to credit the expert's opinion at all. Second, it must determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions." (*Id.* at pp. 1049–1050.)

## C. Analysis

*Vang* resolves defendant's challenges to the hypothetical questions asked in this case. As set forth in the factual summary, *ante*, the prosecutor asked Officer Finney, the prosecution's gang expert, several hypothetical questions. As in *Vang*, these questions were based on hypothetical situations nearly identical to the crimes which occurred in this case, but the use of such questions did not invade the province of the jury. In addition, while the prosecutor attempted to ask Finney specific questions about the culpability of defendant and/or Harris, the court sustained defense counsel's objections to those questions and Finney never addressed the issue. Thus, Finney's responses to the hypothetical questions did not stray from the guidelines for such questions approved in *Vang*.

Ruiz, 2012 WL 4076669, at *25–27.

b.    Federal Standard

A federal court's inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  With respect to the admission of evidence, there is no Supreme Court precedent governing a court's discretionary decision to admit expert testimony concerning an ultimate issue to be resolved by the trier of fact.  Moses v. Payne, 543 F.3d 1090, 1105 (9th Cir. 2005).  Moreover, it is a well-established rule that expert testimony concerning an ultimate issue is permissible.  Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004).  Because there is no clearly established Supreme Court precedent on this issue, federal habeas relief is foreclosed.

///

4.      Instructional Error – "Immediate presence" element

        a.      State Court Opinion

Petitioner next alleges the trial court erred in defining the "immediate presence element" of carjacking, as distinct from robbery.  In rejecting this claim, the appellate court stated as follows:

> In count V, defendant was charged and convicted of carjacking Mosley's vehicle. (§ 215.) Defendant argues the court erroneously defined the "immediate presence" element of carjacking, because it only defined constructive possession instead of physical control.
>
> ***A.  Background***
>
> As set forth in the factual summary, Mosley, one of the customers in the barbershop, had parked his white Dodge Charger behind the business. After the two suspects had taken money and jewelry from the victims in the barbershop, one suspect yelled out and asked who was driving the Dodge Charger. Mosley responded that the car belonged to him. The taller man said, "'Give me the keys.'" Mosley threw his keys on the floor. One of the suspects retrieved the keys and they left the business. McClary, another robbery victim, heard a car start and quickly accelerate. The Dodge was abandoned near the Feliz Drive apartment.
>
> The jury was instructed with CALCRIM No. 1650 as to the elements of carjacking.
>
> > "The defendant is charged in Count 5 with carjacking, in violation of Penal Code section 215.[¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took a motor vehicle that was not his own; [¶] 2. *The vehicle was taken from the immediate presence of a person who possessed the vehicle or was its passenger*; [¶] 3. The vehicle was taken against that person's will; [¶] 4. The defendant used force or fear to take the vehicle or to prevent that person from resisting; and [¶] 5. When the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle either temporarily or permanently." (Italics added.)
>
> The jury was further instructed:
>
> > "A vehicle is within a person's immediate presence *if it is sufficiently within its control so that he could keep possession of it if not prevented by force or fear*. (Italics added.)
>
> Defendant did not object to these instructions or request further definitions.
>
> ***B.  Carjacking***
>
> Carjacking is defined as "the felonious taking of a motor vehicle in the possession of another, *from his or her person or immediate presence*, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means

of force or fear." (§ 215, italics added.)

A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear. (*People v. Medina* (1995) 39 Cal.App.4th 643, 648 (*Medina*).) It is not necessary that the victim be physically present in the vehicle when the confrontation occurs. (*Id*. at p. 650; *People v. Gomez* (2011) 192 Cal.App.4th 609, 623.)

In *Medina*, the victim was lured into a motel room by an accomplice of the defendant. (*Medina, supra*, 39 Cal.App.4th at pp. 646, 651.) There, the defendant and accomplices bound the victim, took his car keys, then took his car. (*Id*. at pp. 646–647.) The defendant challenged his conviction for carjacking, arguing that "actual physical proximity of the victim to the vehicle is required." (*Id*. at p. 649.) *Medina* disagreed, explaining that the "only reason [the victim] was not in the car when it was taken and this was not a 'classic' carjacking, was because he had been lured away from it by trick or device." (*Id*. at pp. 651–652.)

In *People v. Hoard* (2002) 103 Cal.App.4th 599 (*Hoard*), the defendant entered a jewelry store and ordered two employees to give him the keys to the jewelry cases and to the car belonging to Sarah Gibeson, one of the employees. (*Id*. at p. 602.) The employees complied and were then directed into a back room and bound. (*Ibid*.) The defendant took jewelry from the cases and Gibeson's car. (*Ibid*.) *Hoard* relied on *Medina* and affirmed the defendant's carjacking conviction:

> "In the present case, the elements of carjacking were established. Defendant took possession of Gibeson's car by threatening her and demanding her car keys. *Although she was not physically present in the parking lot when he drove the car away, she had been forced to relinquish her car keys. Otherwise, she could have kept possession and control of the keys and her car.* Although not the 'classic' carjacking scenario, it was a carjacking all the same." (*Hoard, supra*, 103 Cal.App.4th at p. 609, italics added, fn. omitted.)

In contrast, in *People v. Coleman* (2007) 146 Cal.App.4th 1363, the court reversed defendant's carjacking conviction based on slightly different facts. The owner of a glass shop drove his Chevrolet Silverado to the shop in the morning, put the keys to the Silverado in a back work area of the shop, then drove away in a truck he used in his business. (*Id*. at p. 1366.) While the owner was away, the defendant entered the shop, pointed a gun at the office manager, and told her to give him the keys to the Silverado. (*Ibid*.) The office manager walked to the back of the shop, grabbed the keys to the Silverado, and gave them to the defendant. (*Ibid*.) The defendant was convicted of robbery and carjacking. (*Id*. at pp. 1365, 1367, fn. 2.)

*Coleman* reversed the conviction for carjacking. *Coleman* acknowledged "that a carjacking may occur where neither the possessor nor the passenger is inside or adjacent to the vehicle," but held the circumstances in the case were "simply too far removed from the type of conduct that [the carjacking statute] was designed to address." (*Coleman, supra*, 146 Cal.App.4th at p. 1373.) The office manager who gave the keys to defendant "was not within any physical proximity to the Silverado, the keys she relinquished were not her own, and there was no evidence that she had ever been or would be a driver of or passenger in the Silverado." (*Ibid*.)

In *People v. Gomez, supra*, 192 Cal.App.4th 609, defendant and three accomplices

assaulted Estrada at an apartment complex where Estrada lived. During the attack, one of the assailants obtained the keys to Estrada's pickup truck. After beating Estrada, the four men left the apartment complex in defendant's car, then returned 10 or 20 minutes later. By that time, Estrada was inside his apartment. Two of the four assailants got into Estrada's truck and drove away. (Id. at pp. 677–678.) *Gomez* held there was substantial evidence to support defendant's conviction for carjacking.

> "The immediate presence requirement is more easily met in this case than in *Medina* or *Hoard*.  Here, although Estrada was inside his apartment at the time the [suspects] took his truck, the truck was only approximately 10 feet away from him. He watched the men through his window and made eye contact with them. Under the circumstances described above, the jury could reasonably find that Estrada was fearful of a further assault and would have acted to stop the [suspects] and retain possession of his truck if not prevented by such fear. The fact that 10 or 20 minutes had elapsed between the physical assault and the taking of the keys is insignificant. Regardless of the passage of time, fear was being used against Estrada at the time the vehicle was taken." (*People v. Gomez, supra*, 192 Cal.App.4th at p. 624.)

*Gomez* distinguished the case from *Coleman*, since the keys were taken directly from Estrada during the physical assault. (*People v. Gomez, supra*, 192 Cal.App.4th at p. 625.)

### C.  Analysis

Defendant contends that CALCRIM No. 1650 erroneously defined carjacking to include taking a vehicle from the victim's constructive possession, and the instruction should have included taking the vehicle involving "the concept of physical control." Defendant argues that additional language should have been given for the following reasons:

> "[T]he owner's keys were taken in another location and his car driven away. Jurors sorely needed instruction on physical control to resolve the immediate presence issue here for purposes of carjacking. Instead, these skewed and misleading instructions pointedly suggested that for carjacking (unlike robbery) it did not matter if the victim had any proximate physical control of his car." (Fn. omitted.)

Defendant further asserts that "[w]ithout the element of *physical* control in this definition, immediate presence was stretched into expansive concepts of constructive possession phrased in overly broad terms of the right to control. Mr. Mosley had the 'right to control' his car no matter where it was parked in town. The conspicuous omission of physical control from carjacking (but not robbery) meant [defendant] was guilty even if the car was parked blocks away or across down. This was unfair. Jurors needed to know the settled requirement that there has to be some element of proximate physical control (not bare right to control as might show constructive possession) to show immediate presence)." (Original italics.)

Defendant's arguments seem to challenge the statutory definition of carjacking, and convictions under that statute, since section 215 defines the offense as "the felonious taking of a motor vehicle in the possession of another, *from his or her person or immediate presence*. ..." (Italics added.) CALCRIM No. 1650, as given

1
2
3
4
5
6
7

to the jury, correctly states the elements of this offense, including the definition of "immediate presence." (*People v. Gomez, supra*, 192 Cal.App.4th at p. 623.) A violation of section 215 does not require the vehicle to be taken from the direct physical control of the owner. As shown by *Medina*, *Hoard*, *Gomez*, and even *Coleman*, the jury in this case was properly instructed and defendant's conviction for carjacking is supported by substantial evidence. Indeed, this case is quite similar to the facts in *Hoard*. One of the robbers demanded the identity of the owner of the Dodge Charger. Mosley claimed ownership, and he was ordered to turn over the keys at gunpoint. Mosley was already lying on the floor. He pushed the keys across the floor, and one of the suspects picked up the keys. The vehicle was parked behind the barbershop, and another robbery victim heard a vehicle driving away shortly after the two robbers left the store. The suspects abandoned the vehicle within minutes.

8
9
10
11
12

Defendant complains that the carjacking instruction should have included the concept of physical control, using language used in robbery instructions. Defendant seems to suggest that he only could have been convicted of carjacking if the jury had been instructed that the vehicle was taken from the direct physical control of the victim. As we have explained, however, the jury herein was properly instructed with the definition of carjacking and immediate presence, and there is overwhelming evidence to support defendant's conviction for carjacking based on demanding and then taking the car keys from the owner at gunpoint, while the vehicle was parked just behind the scene of the crime.

13
14
15
16
17

Defendant contends that his instructional challenge is supported by *People v. Hayes* (1990) 52 Cal.3d 577 (*Hayes*), but his reliance on *Hayes* is misplaced. In *Hayes*, the trial court's instructions on immediate presence were held erroneous because they allowed the jury to find that element satisfied so long as the victim perceived any overt act connected with the robbery's commission, such as the defendant's use of force or fear. (*Id*. at pp. 627–628.) *Hayes* found this "rendered the 'immediate presence' element devoid of all independent meaning, making it redundant with the 'force or fear' element." (*Id*. at p. 628.)

18
19

*Hayes* does not undermine the holdings of *Hoard*, *Medina*, and *Gomez*, that taking the victim's car keys at gunpoint and then driving off with the victim's nearby car, satisfied the immediate presence element of carjacking.

20

We thus conclude the jury was properly instructed and his conviction for carjacking is supported by overwhelming substantial evidence.

21

Ruiz, 2012 WL 4076669, at *36–39.

22

    b.  Federal Standard

23

   Initially, the Court notes that a claim that a jury instruction violated state law is not

24

cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain

25

federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

26

instruction by itself so infected the entire trial that the resulting conviction violates due process.

27

See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v.

28

DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the

36

1    instruction is undesirable, erroneous or even "universally condemned," but that it violated some

2    [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be

3    considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S.

4    at 72.  In other words, the court must evaluate jury instructions in the context of the overall

5    charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S.

6    152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843

7    F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per

8    curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect

9    self-defense defining "imminent peril" where three other instructions correctly stated the law).

10   Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

11   misstatement of the law." Henderson, 431 U.S. at 155.

12       In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had

13   substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v.

14   Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

15   (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review

16   of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted

17   in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47

18   (1998).

19              c.    Analysis

20       The state court reasonably determined that the jury was properly instructed on the

21   definition of carjacking.  Cal. Penal Code § 215 defines carjacking as the "felonious taking of a

22   motor vehicle in the possession of another, from his or her person *or immediate presence*, . . . ,

23   against his or her will and with the intent to either permanently or temporarily deprive the person

24   in possession of the motor vehicle of his or her possession, accomplished by means of force or

25   fear." Cal. Penal Code § 215 (italics added).  Under California law, it is not necessary that the

26   person be physically in the vehicle when it is taken.  People v. Gomez, 192 Cal.App.4th 609, 623

27   (2011).  Rather, it is enough that the vehicle be sufficiently within his control so that he could

28   retain possession of it if not prevented by force or fear.  People v. Medina, 39 Cal.App.4th 643,

648 (1995).

The jury was instructed with CALCRIM No. 1650 on the elements of carjacking.  The second element of the instruction stated: "The vehicle was taken from the immediate presence of a person who possessed the vehicle or was its passenger."  The jury was further instructed that "[a] vehicle is within a person's immediate presence if it is sufficiently within its control so that he could keep possession of it if not prevent by force or fear."  Therefore, the jury was instructed precisely with the definition of carjacking under California law.  Accordingly, the claim fails, since the Court is bound by the state court's interpretation of its own law.  Waddington, 555 U.S. at 192 n.5.

5.   Instructional Error – "In association with a criminal street gang" element

a.   State Court Opinion

In a similar claim, Petitioner contends the trial court erred in defining the technical terminology: "in association with a criminal street gang" concerning the gang enhancement.  The appellate court denied the claim as follows:

> Defendant next contends the court had a sua sponte duty to further define the phrase "in association with" as to the gang enhancement, and asserts the phrase included technical terms which the jury could not understand without additional definitions.
>
> **A. Background**
>
> The jury was instructed with CALCRIM No. 1401 as to the elements of the gang enhancement.  The jury was instructed that one of the elements was that the defendant committed the underlying offense "for the benefit of, at the direction of, or in association with a criminal street gang." (Italics added.) However, the court did not define the phrase "in association with," and defendant did not request additional instructions.
>
> **B. Analysis**
>
> Defendant argues that the court had a sua sponte duty to define "in association with" in CALCRIM No. 1401, because Albillar allegedly "loosen[ed] the definition of gang intent," and the court's sua sponte duty derives from "[t]he majority opinion in Albillar, as well as Justice Werdegar's concurrence [in Albillar], [which] confirm the 'in association' element is indeed a technical term susceptible of misunderstanding and misuse...."
>
> Defendant's argument misconstrues Albillar, which did not give a technical, legal meaning to the statutory language of section 186.22, subdivision (b). In her separate opinion in Albillar, Justice Werdegar only concurred as to the majority's discussion of section 186.22, subdivision (a)'s substantive gang offense. However,

she strongly dissented as to the majority opinion's conclusion that the gang enhancement in that case was supported by substantial evidence as to the "benefit" and "association" elements, particularly the majority opinion's primary reliance on the expert's opinion to provide that substantial evidence. (*Albillar, supra*, 51 Cal.4th at pp. 68, 70–73 (conc. & dis. opn by Werdegar, J.).) The dissent also took strong exception to the majority opinion's definition of "in association with," and declared it rendered the language of section 186.22, subdivision (b) redundant. (*Id.* at pp. 73–74.) The dissent concluded the jury's findings on the gang enhancements should be reversed because it "necessarily relied on the construction of the phrase provided by the prosecutor, a construction neither consistent with the statute nor endorsed by the majority." (*Id.* at p. 74.)

Justice Werdegar did not advocate a specific definition for "in association with," but criticized the majority opinion for reliance on the expert's opinion to provide substantial evidence in light of the prosecutor's purported erroneous definition of the phrase.

In any event, defendant has failed to show that the statutory language, "committed for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)(1)) has a definition that differs from its nonlegal meaning. (*People v. Estrada* (1995) 11 Cal.4th 568, 574–575; *People v. Poggi* (1988) 45 Cal.3d 306, 327.) Indeed, Justice Werdegar's dissent cited to a definition of "associate" from the "Merriam–Webster's Eleventh Collegiate Dictionary (2004)." (*Albillar, supra*, 51 Cal.4th. at p. 70, fn. 2 (dis. & conc. opn. of Werdegar, J.).) "'When a word or phrase "'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.'" [Citations.]' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 670.) Therefore, having failed to request a clarifying instruction, defendants forfeited their objection. (*People v. Russell* (2010) 50 Cal.4th 1228, 1273; *People v. Jennings, supra*, 50 Cal.4th at p. 671.)

Even if the argument were preserved, we would not find any prejudice. (*People v. Gamache* (2010) 48 Cal.4th 347, 376 (*Gamache*); *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101.) Officer Finney explained at length what it meant to commit a crime in association with or for the benefit of a gang.

Ruiz, 2012 WL 4076669, at *35–36.

   b.  Federal Standard and Analysis

  The same federal standard recited in claim four, *supra*, applies here, and for essentially the same reasons, the claim fails. The state court determined that the instruction complied with California law. In addition, the state court reasonably determined that the phrase "in association with" is commonly understood and is not used in a technical sense. The court further found no prejudice since Officer Finney detailed and explained the term. Petitioner fails to demonstrate how the instruction was so erroneous that it violated his due process rights. The claim should be denied.

6.      Instructional Error – Gang Evidence and Enhancements

a.      State Court Opinion

Petitioner next claims the state court's instructions on gang evidence and gang enhancements were erroneous.  The Fifth DCA denied the claim as follows:

Defendant challenges the instructions regarding the jury's consideration of the gang evidence, and contends these instructions overstated and erroneously defined the extent to which the jury could rely on the gang evidence to convict him of the substantive offenses.

"'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (People v. Bolin (1998) 18 Cal.4th 297, 328.) [N.9]

> [N.9] Defendant raises a series of instructional issues on appeal. He failed to object to or raise any of these same instructional challenges during trial. Defendant asserts that he has not forfeited review of these issues since the alleged instructional errors affected his substantial rights. In the alternative, he claims that his defense attorney's failure to object to these issues constitutes prejudicial ineffective assistance. Defendant is correct that an instructional error that affects the defendant's substantial rights may be reviewed on appeal despite the absence of an objection. (§ 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) We will therefore address the merits of his various instructional challenges.

*A. Background*

The jury received several instructions regarding the limited purpose and consideration of the gang evidence and the expert's testimony on that topic.

CALCRIM No. 303 stated:

> "During the trial, certain evidence was admitted for limited purpose. You may consider that evidence only for that purpose and for no other."

CALCRIM No. 332 addressed the testimony of an expert witness:

> "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide.
>
> "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.
>
> "In addition, consider the expert's knowledge, skill, experience, training,

and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.

"You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. The hypothetical question asked the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved.

"If you conclude that an assumed fact is not true, consider the affect of the expert's reliance on that fact in evaluating the expert's opinion."

In CALCRIM No. 360, the jury was cautioned regarding the limited admissibility of Detective Finney's testimony about the statements made by Tierre Hester, Sr., that defendant was a member of ESC:

"Detective Josh Finney testified that, in reaching his conclusions as an expert witness, he considered statements by a Tierre Hester, Sr. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statement or statements is true."

CALCRIM No. 1403, the limited admissibility of gang evidence, stated:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with *the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged, or the defendant had a motive to commit the crimes charged*. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his opinion. [¶] *You may not consider this evidence for any other purpose*. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crimes." (Italics added.)

## B. Analysis

Defendant contends CALCRIM No. 1403 "grossly overstated" the purposes for which the gang evidence could be considered in this case, and "grossly fails to specify and segregate the various types of gang and other crimes evidence admitted for various purposes."

Given its inflammatory impact, "[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) "Thus, as [a] general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*Albarran, supra*, 149 Cal.App.4th at p. 223.) "Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity,

41

motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*Hernandez, supra*, 33 Cal.4th at p. 1049.)

The trial court "must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury." (*Albarran, supra*,149 Cal.App.4th at p. 224.) Despite its potential for prejudice, however, gang evidence "is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative. [Citations.]" (*Samaniego, supra*, 172 Cal.App.4th at p. 1167.) "The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.]" (*People v. Gonzalez, supra*, 126 Cal.App.4th at p. 1550.) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" (*Samaniego, supra*, 172 Cal.App.4th at pp. 1167–1168.) Gang evidence may also be relevant on the issue of a witness's credibility. (*Id*. at p. 1168.)

As given in this and other cases, including the language complained of by defendant, CALCRIM No. 1403 "is neither contrary to law nor misleading. It states in no uncertain terms that gang evidence is not admissible to show that the defendant is a bad person or has a criminal propensity. It allows such evidence to be considered only on the issues germane to the gang enhancement, the motive for the crime and the credibility of witnesses." (*Samaniego, supra*, 172 Cal.App.4th at p. 1168.) In addition, CALCRIM No. 332 has also been approved regarding the limited admissibility of a gang expert's testimony. (*Vang, supra*, 52 Cal.4th at p. 1050.) The jury herein was correctly instructed on the limited admissibility of gang evidence.

Defendant also asserts the court had a sua sponte duty to give an additional limiting instruction, similar to former CALJIC No. 2.50.2, that the jury could not consider evidence of other gang crimes unless that evidence was proven by a preponderance of the evidence. CALJIC No. 2.50.2 defined the preponderance evidentiary standard. The preponderance standard is at the lowest end of the spectrum, and is more typical in civil than criminal cases. (*Addington v. Texas* (1979) 441 U.S. 418, 423.) A preponderance of the evidence standard of proof merely requires a finding that the fact to be proven is more likely than not. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 852.) The jury was instructed to consider the instructions as a whole (CALJIC No. 1.01). The instructions as a whole clearly indicated that the prosecution had the burden of proving the defendant guilty of all charged offenses beyond a reasonable doubt. (CALCRIM No. 220.) Even assuming the trial court had a sua sponte duty to provide the jurors with a definition of "preponderance of the evidence," it is not reasonably likely the jury misunderstood the instructions in the manner suggested by defendant. (See *People v. Clair* (1992) 2 Cal.4th 629, 662–663.)

Defendant asserts that CALCRIM No. 360, about the limited consideration of Hester's statements to Detective Finney, was inconsistent with CALCRIM No. 332, about the consideration of the expert's opinion testimony. This argument is also meritless based on the entirety of the instructions. The jury was instructed about the limited purpose of certain evidence (CALCRIM No. 303), and it could not consider Hester's statements to Finney as proof that the information contained in the statement or statements is true. (CALCRIM No. 360).

Ruiz, 2012 WL 4076669, at *28–30.

42

b.      Federal Standard and Analysis

The same standard for instructional errors previously set forth applies.  Here as well, the claim fails because the state court determined that the jury instructions were proper under California law.  The federal court is bound by the state court interpretation of its law. Waddington, 555 U.S. at 192 n.5.

Petitioner complains that an additional limiting instruction on the use of gang evidence should have been given, since the instructions permitted the jury to use the gang evidence for improper purposes.  As noted by the appellate court, however, the jury was instructed in no uncertain terms that the evidence could not be used to find that Petitioner was a bad person or had a criminal propensity.  The jury was instructed that it could consider the evidence only for purposes of the gang enhancement, the motive for the crime, and the credibility of witnesses. Even if the Court could consider the claim, Petitioner fails to demonstrate how the instructions as given were so erroneous as to deprive him of a fair trial.  The claim should be rejected.

7.      Instructional Error – CALCRIM No. 373

a.      State Court Opinion

In his next ground for relief, Petitioner argues that the trial court erred by instructing the jury with CALCRIM No. 373 on unjoined perpetrators.  The Fifth DCA rejected the claim as follows:

> Defendant next contends the court erroneously instructed the jury with CALCRIM No. 373, not to speculate about the absence of unjoined perpetrators. Defendant argues the instruction violated his due process rights because it prevented the jury from speculating why Ashli Winters and Terrance Ellis were not being prosecuted for their purported involvement in the barbershop robberies.
>
> **A. Background**
>
> The jury received CALCRIM No. 373 as follows:
>
> > "The evidence shows that another person may have been involved in the commission of the crimes charged against the defendant. *There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial.* [¶] *You must not speculate about whether that other person has been or will be prosecuted.* Your duty is to decide whether the defendant on trial here committed the crimes charged." (Italics added.)
>
> Defendant did not object to this instruction.

43

### B. Analysis

Defendant contends this instruction was erroneous because it prevented the jury from "speculating" about the prosecution testimony of Terrance Ellis and Ashli Winters. Defendant asserts his constitutional rights were violated because the jury should have been permitted to consider "what effect potential future prosecution had on these witnesses.... Jurors needed to fully air out whether these witnesses' accounts were the result of serious fears of prosecution of themselves and others the defense argued were covering for." Defendant asserts that jury could have construed the instruction "to limit their discussion of why Winters or Ellis were not on trial too—and whether they would be prosecuted in the future."

First, the entirety of the record demonstrates that CALCRIM No. 373 was directed at the complete absence of Patrick Harris from this case, either as a codefendant or a witness for either side. The prosecution introduced overwhelming evidence that defendant and Harris committed the barbershop robberies together. Indeed, Harris was initially charged with defendant in this case, but the prosecution opted to try the case against defendant only. In any event, the plain language of the instruction was directed to the absence of Harris as a codefendant in this case.

Second, CALCRIM No. 373 has been approved as a correct statement of the law. The instruction "does not tell the jury it cannot consider evidence that someone else *committed* the crime. [Citation.] It merely says the jury is not to speculate on whether someone else might or might not be *prosecuted*." (*People v. Farmer* (1989) 47 Cal.3d 888, 918–919, italics in original.)

Third, to the extent the instruction was erroneous, any error is harmless given the entirety of the instruction. In *People v. Brasure* (2008) 42 Cal.4th 1037 (*Brasure*), the trial court instructed the jury with the predecessor instruction to CALCRIM No. 373, which was CALJIC No. 2.11.5, and stated:

> "'There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crimes for which the defendant is on trial. [¶] There may be many reasons why that person is not here on trial. *Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted.* Your sole duty is to decide whether the People have proved the guilt of the defendant on trial.'" (*Brasure, supra*, 42 Cal.4th at p. 1055, fn. 12, italics added.)

*Brasure* held the trial court should not have given CALJIC No. 2.11.5 "in unmodified form" with regard to two prosecution witnesses who were accomplices or possible accomplices in that case. (*Brasure, supra*, 42 Cal.App.4th at p. 1055.) However, *Brasure* also held the instructional error was not prejudicial because the jury received a full set of instructions on witness credibility and assessing the testimony of accomplices, "including the direction to consider the existence of any 'bias, interest, or other motive' on a witness's part (CALJIC No. 2.20) and to view the testimony of an accomplice with caution (CALJIC No. 3.18). Where the jury has been so instructed, we have repeatedly held, giving CALJIC No. 2.11.5 is not prejudicial error." (*Id.* at p. 1055.)

> "'When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants,

and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses.'" (*Brasure, supra*, 42 Cal.App.4th at pp. 1055–1056.)

As applied to the instant case, the pattern instruction for CALCRIM No. 373 includes the option of bracketed closing language which states: "[This instruction does not apply to the testimony of _____<insert names of testifying coparticipants>.]" The Bench Notes to CALCRIM No. 373 state that "[i]f other alleged participants in the crime are testifying, this instruction should not be given or the bracketed portion should be given exempting the testimony of those witnesses." The Bench Notes further state that "[i]t is not error to give the first paragraph of this instruction if a reasonable juror would understand from all the instructions that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility." (See also *People v. Fonseca* (2003) 105 Cal.App.4th 543, 549–550.)

To the extent that the instruction may have been erroneous as to the prosecution testimony of Ellis and Winters, any error was harmless. The jury was well aware that Ellis was initially considered a suspect, Winters had been advised that she faced prosecution if she had shielded the suspects, and that Winters testified under a grant of immunity. More importantly, the jury herein was also instructed on the full range of factors to consider the credibility of witnesses pursuant to CALCRIM No. 226, including whether the witness' testimony was influenced by bias, prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case was decided; the witness' attitude about the case or about testifying; and whether the witness was promised immunity or leniency in exchange for his or her testimony. The jury also received CALCRIM No. 318, to determine whether a witness' prior inconsistent statements were true or false. Any error in giving CALCRIM No. 373 without the bracketed language was thus harmless. (*Brasure, supra*, 42 Cal.App.4th at p. 1055.)

Ruiz, 2012 WL 4076669, at *39–41.

### b.   Federal Standard and Analysis

The federal standard for instructional error previously set forth applies to this claim as well.  The claim fails because the state court concluded that CALCRIM No. 373 was a correct statement of the law.  Therefore, this Court is bound by that ruling.  Moreover, a reasonable jurist could have concluded that the instruction did not deprive Petitioner of a fair trial.  It was clear that the instruction was directed at the absence of Petitioner's co-defendant, Patrick Harris, who was tried separately.  In addition, the instruction did not preclude the jury from speculating on whether a witness committed the crime, only whether someone else might or might not be prosecuted.

Finally, the state court reasonably concluded that any error was harmless.  As noted by the appellate court, the jury knew that Ellis was initially considered a suspect, and that Winters had been granted immunity in exchange for her testimony.  Any alleged error could have had no

1    effect on the jury's verdict.  The claim should be denied.

2           8.      Instructional Error – CALCRIM No. 376

3                   a.      State Court Opinion

4           In a related claim, Petitioner contends the trial court erred by instructing the jury with

5    CALCRIM No. 376.  The Fifth DCA denied the claim as follows:

> Defendant argues the court erroneously instructed the jury with CALCRIM No. 376, that the jury may consider defendant's possession of recently stolen property if there was other supporting evidence of guilt. Defendant argues the pattern instruction reduced the prosecution's burden of proof as to identity and permitted an irrationally permissive inference of guilt as to the charged offenses. Defendant did not object to this instruction.
>
> As defendant acknowledges, this argument has been repeatedly rejected. CALCRIM No. 376, like its predecessor instruction, CALJIC No. 2.15, "is an instruction generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime. [Citations.] In the presence of at least some corroborating evidence, it permits—but does not require—jurors to infer from possession of stolen property guilt of a related offense such as robbery or burglary." (*Gamache, supra,* 48 Cal.4th at p. 375.) CALCRIM No. 376 is thus appropriate in cases charging robbery and/or theft. (*Gamache, supra,* 48 Cal.4th at p. 375.)
>
> Moreover, the California Supreme Court has previously held CALJIC No. 2.15 "does not establish an unconstitutional mandatory presumption in favor of guilt [citation] or otherwise shift or lower the prosecution's burden of establishing guilt beyond a reasonable doubt [citations]." (*Gamache, supra,* 48 Cal.4th at p. 376.) On this point, the relevant language in CALCRIM No. 376 and CALJIC No. 2.15 is "linguistically synonymous" and "constitutionally indistinguishable." (*People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1036; see also *People v. Moore* (2011) 51 Cal.4th 1104, 1130–1131.) We are bound to follow and apply the California Supreme Court's holding and reject defendant's contrary assertions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

20   <u>Ruiz</u>, 2012 WL 4076669, at *41.

21                   b.      Federal Standard and Analysis

22          The standard for instructional error also applies here.  The claim is without merit insofar

23   as the state court determined that CALCRIM No. 376 correctly stated the law concerning the use

24   of evidence of possession of stolen property.  In fact, the instruction has been found to be

25   defendant-friendly since it emphasizes that possession of stolen property, by itself, is insufficient

26   to find a defendant guilty of a theft-related crime.  This Court is bound by the state court's

27   interpretation of its law.  In addition, Petitioner fails to show how a rational jurist could not find

28   that the instruction did not deprive Petitioner of a fair trial.

9.      Statutory Speedy Trial Rights

            a.      State Court Opinion

Petitioner next claims the trial court erred by denying his motion to dismiss based on statutory speedy trial violations. The appellate court examined the pretrial record and then rejected the claim, concluding as follows:

> In this case, as in *Sutton*, the entirety of the record demonstrates that defendant's statutory right to a speedy trial pursuant to section 1382 was not violated because there was good cause to grant the continuances in this case. On July 2, 2009, defendant waived time for trial plus for an additional 10 court days. The jury trial on the consolidated information was set for December 7, 2009. On that day, however, the court determined that Harris's competency had still not been resolved. On both December 7 and 9, 2009, defendant did not object to continuing the matter until the competency issue was clarified, and even agreed to trail the jury trial to December 14, 2009.

> Defendant's time waiver remained in effect until December 14, 2009, when he objected to the court's decision to further continue the jury trial on the consolidated information. However, codefendant Harris's public defender stated that he was not prepared for the jury trial on the consolidated information. In addition, the court conducted an in camera hearing and determined the existence of a conflict required relief of Harris's public defender, and conflict counsel had to be appointed.

> At that point, defendant and codefendant Harris were charged in the consolidated information with the barbershop carjacking and robberies. Based on *Sutton*, the court did not abuse its discretion, pursuant to section 1382 and section 1050.1, when it decided to continue the trial because Harris's public defender was not prepared; a valid conflict existed between Harris and his public defender; the court had to relieve the public defender; and the court-appointed conflict counsel who stated that he was not prepared for trial that day. Thus, on January 22, 2010, the court properly denied defendant's motion to dismiss for the alleged violation of his right to a speedy trial based on the December 14, 2009, continuance.

> In addition, the court did not abuse its discretion when it decided to grant another continuance on January 22, 2009. As set forth ante, Harris's newly-appointed attorney stated he was not ready for trial on the consolidated information because of voluminous discovery. Again, defendant was still charged with codefendant Harris in the consolidated information with the barbershop robberies and carjacking. Based on those circumstances, the court properly found good cause to continue the consolidated matter over defendant's objections. For the same reasons, on April 28, 2010, the court properly denied defendant's subsequent motion to dismiss for the alleged violation of his right to a speedy trial.

> After defendant's case was severed from codefendant Harris and the other two codefendants, defendant filed another motion to dismiss during pretrial motions in limine. The court did not abuse its discretion when it denied this motion, and properly found the prosecution had not abused the consolidation process when it sought to file the consolidated information against defendant and codefendant Harris. For similar reasons, the court properly denied defendant's new trial motion to the extent it was based on the alleged violation of his right to a speedy trial.

As in *Sutton*, the consolidated cases were properly joined in this case, the court properly granted continuances in this case for good cause, and it did not abuse its discretion when it denied defendant's motion to dismiss for the alleged violation of his right to a speedy trial. As explained ante, the relevant factors to determine good cause under section 1382 are "(1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay." (*Sutton, supra*, 48 Cal.4th at p. 546, fn. omitted; *Hajjaj, supra*, 50 Cal.4th at pp. 1196–1197.) As applied to this case, the nature and strength of the justification for the delays were valid based on the reasons expressed by the attorneys for codefendant Harris. The duration of the delays were not unreasonable, since defendant's jury trial began within six months after he withdrew his time waiver. More importantly, there is no evidence that defendant suffered any prejudice because of the delay. Defendant never stated that any witnesses or evidence became unavailable because of the delay. Indeed, the six-month delay proved beneficial to defendant because the prosecution ultimately withdrew its opposition to defendant's numerous motions to sever his case from that of codefendant Harris and the other codefendants charged in the consolidated information.

We further find that defendant's right to a speedy trial was not violated upon a consideration of federal constitutional factors. As explained ante, the relevant criteria are: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker, supra*, 407 U.S. at p. 530, fn. omitted.) The length of the delay serves as a "triggering mechanism." (*Ibid.*) Generally, a post-accusation delay is considered " 'presumptively prejudicial' " when it approaches one year. (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1.) In this case, however, there was only a six-month delay between defendant's last waiver of time and the subsequent start of his jury trial.

The second factor, the reasons for the delay, requires "different weights [to] be assigned to different reasons." (*Barker, supra*, 407 U.S. at p. 531.) "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Ibid.*, fn. omitted.) As explained *ante*, the superior court properly found that the prosecution did not abuse the process when it sought to consolidate the matters, and there was abundant good cause to grant the continuances based on the representations from codefendant's Harris's two attorneys that they were not ready for trial at the relevant times.

The third factor, the defendant's assertion of his right, weighs in defendant's favor, since he explicitly asserted his right to a speedy trial beginning on December 14, 2009. (*Barker, supra*, 407 U.S. at pp. 531–532.)

However, the fourth factor, the prejudice to the defendant, clearly weighs against him. This factor is assessed in light of the interests a speedy trial was designed to protect: preventing "oppressive" pretrial incarceration, minimizing "anxiety and concern of the accused," and "limit[ing] the possibility that the defense will be impaired." (*Barker, supra*, 407 U.S. at p. 532, fn. omitted.) Whether the defense is impaired is the most serious consideration for this final factor. (*Ibid.*) As explained ante, defendant never made any showing of prejudice, oppressing pretrial incarceration, or that the defense was impaired by the six-month delay in this case.

1
2
> More importantly, defendant actually received a benefit given the prosecution's ultimate decision to withdraw its opposition to his repeated motions for severance, and he was tried by himself only for the barbershop robberies and carjacking.

3
4
> Balancing these factors, we conclude defendant's constitutional right to a speedy trial was not violated.

5   Ruiz, 2012 WL 4076669, at *18–20.

6           b.      Federal Standard

7           A speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution.

8   Beavers v. Haubert, 198 U.S. 77 (1905).  The right to a speedy trial is 'fundamental' and is

9   imposed by the Due Process Clause of the Fourteenth Amendment on the States.  Kloper v. North

10  Carolina, 386 U.S. 213 (1967).  The right to a speedy trial is evaluated pursuant to the factors set

11  forth in Barker v. Wingo, 407 U.S. 514 (1972): 1) the length of delay; 2) the reason for the delay;

12  3) the defendant's assertion of his right; and 4) prejudice to the defendant.  Id. at 530.

13          c.      Analysis

14          The claim is without merit.  First, Petitioner presents only a state law claim.  He alleges

15  the state did not comply with statutory law.  See Pet. at 5.  As set forth above, the state court

16  determined that Cal. Penal Code § 1382 had not been violated.  This Court is bound by that

17  determination, and habeas relief is foreclosed.  See Estelle, 502 U.S. at 68 ("We have stated many

18  times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting Lewis, 497

19  U.S. at 780); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (federal courts are

20  bound by state court rulings on questions of state law).

21          Even if the Court were to consider a speedy trial claim under the Sixth Amendment, the

22  result is the same.  The appellate court reasonably applied the four-factor speedy-trial standard set

23  forth in Barker, 407 U.S. at 530.  First, the court noted that the delay had only been six months,

24  and such a delay is not presumptively prejudicial.  The Supreme Court has held that "until there is

25  some delay which is presumptively prejudicial," there is no need to inquire into the other three

26  Barker factors.  Id.  The Supreme Court further stated that "[d]epending on the nature of the

27  charges, the lower courts have generally found post[-]accusation delay 'presumptively prejudicial'

28  at least as it approaches one year."  Doggett v. United States, 505 U.S. 647, 652 n.1 (1992).  Since

the delay of six months here was not presumptively prejudicial, there is no need to inquire further.

The state court also determined that the second factor, reasons for the delay, weighed against Petitioner.  The court noted that there was abundant good cause for the delay.  The third factor weighed in favor of Petitioner since he did assert his right to a speedy trial.  However, the fourth factor weighed against him since there was no showing that the delay prejudiced his case in any way.  Accordingly, the state court reasonably determined that Petitioner's right to a speedy trial was not violated.  For the foregoing reasons, the claim should be denied.

10.   Cumulative Error

Petitioner claims that the cumulative effect of the errors arose to the level of a constitutional violation.  "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation.  See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  In this case, no errors occurred, and hence, there can be no cumulative error.

11.   Calculation of Presentence Credits

Petitioner alleges that the trial court erred in its calculation of his presentence credits by failing to award him with one day.  The government conceded the claim on direct appeal, and the state court corrected the record to reflect the proper amount of credit.  Therefore, the claim is moot.

**IV.   RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus (Doc. 1) be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one days after being served with a copy of this Findings and Recommendation, any party

50

may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:   **March 19, 2017**                **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE